# EXHIBIT A

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Richard A. Posner | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4954 | **DATE** | 12/6/2004 |
| **CASE TITLE** | Pinpoint, Inc. vs. Amazon.com, Inc. et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated, Pinpoint did not have standing to file this suit. I have therefore no choice by to direct the entry of judgment dismissing it (without prejudice), and voiding all previous judicial orders entered in the case, since they were entered in a case over which this court never obtained subject-matter jurisdiction. Trial set for December 6, 2004 is stricken. All pending motion are moot. Each side is assessed $750.00 in jury costs, for a total amount of $1,500.00. Parties are given 21 days from the date of this judgment to tender their checks to the Clerk, U.S. District Court. All matters in controversy having been resolved, final judgment is hereby entered in favor of all defendants and against plaintiff.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 7 - 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 233 |
| | Copy to judge/magistrate judge. | | | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

DOCKETED
DEC 7 - 2004

| | |
|---|---|
| PINPOINT, INC. | ) |
| *Plaintiff,* | ) DEC 7 - 2004 |
| | ) No. 03 C 4954 |
| | ) Richard A. Posner, |
| | ) Circuit Judge, |
| | ) sitting by designation |
| v. | ) |
| AMAZON.COM, INC., *et al.,* | ) |
| *Defendants.* | ) |

## OPINION

POSNER, *Circuit Judge*. Pinpoint filed this suit last year against Amazon.com and affiliates (for simplicity I'll pretend that "Amazon.com" is the only defendant) for infringement of two business-method patents, U.S. Patent Nos. 5,758,257 and 6,088,722. The patents describe methodologies based on statistical theory, mathematics, and formal logic by which a retailer such as Amazon.com can identify customer preferences and use those preferences to make recommendations to the customers for additional purchases. Amazon.com denies infringement but also argues that the patents are invalid because of obviousness or anticipation.

When the case was reassigned to me last month for trial, Amazon.com's challenge to Pinpoint's standing to bring this suit had not yet been resolved, and I set it for an evidentiary hearing on December 3, 2004. The hearing having now been

held, I set forth here my findings of fact (simplified wherever possible to do without material inaccuracy) and conclusions of law. Fed. R. Civ. P. 52(a).

The parties agree that the plaintiff in a patent infringement suit has the burden of proving that it owned the patent or (as here) patents on which its suit is based when it filed the complaint. *United States v. Hays*, 515 U.S. 737, 743 (1995); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Fieldturf, Inc. v. Southwest Recreational Industries, Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004); *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004). They further agree that unless this condition is satisfied, the district court lacks subject-matter jurisdiction. See *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093–94 (Fed. Cir. 1998); *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779–80, amended, 104 F.3d 1296 (Fed. Cir. 1996).

The essential distinction on which the analysis in this opinion turns is between "inventor" and "owner." Patent law requires that the (or an) inventor of a patented invention be listed in the patent regardless of whether he is the (or an) owner of the patent. 35 U.S.C. §§ 102(f), 116; *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348–49 (Fed. Cir. 1998). "The statute imposes no requirement of potential ownership in the patent on those seeking to invoke it." *Chou v. University of Chicago*, 254 F.3d 1347, 1358 (Fed. Cir. 2001). Nothing is more common than for an inventor to agree that the owner of a patented product or process that he invents will be someone besides himself, such as his employer. Amazon.com contends that the owner of Pinpoint's two patents at the time the complaint was filed was the University of Pennsylvania. The university has since assigned its patent rights to Pinpoint but the assignment comes too late to confer standing. Pinpoint recognizes this but argues that the university never owned the patents and that in any event one of the inventors listed in the patents, Wachob, not having been affiliated with the university, is a co-owner who assigned his patent rights to Pinpoint before the lawsuit began; if so, Pin-

point, as a co-owner with the University of Pennsylvania, had standing to sue. See 35 U.S.C. § 262; *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1465–66 (Fed. Cir. 1998); *Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1481 (Fed. Cir. 1986).

The patents list four inventors besides Wachob: Herz, Ungar, Zhang, and Salganicoff. Herz is the principal of Pinpoint; Ungar and Zhang are professors at the University of Pennsylvania. No evidence was presented at the hearing about Salganicoff, and he is barely mentioned in the briefs on standing. I discuss his bearing on the case in the course of my discussion of Wachob.

The inventive activity that culminated in the patented inventions followed the signing in 1994 by Herz, Ungar, and the University of Pennsylvania of a "Sponsored Research Agreement" whereby Herz agreed to finance research by Ungar. The agreement makes clear that all intellectual property resulting from the research belongs to the University of Pennsylvania, except research "made solely by SPONSOR [i.e., Herz] or employees of SPONSOR using facilities other than PENN'S." Attachment A to the agreement describes the sponsored research, which is to say the research the fruits of which belong to the university, as including "obtaining, organizing, entering and editing data on viewer preference characteristics," "searching for the best statistical methods to be employed in obtaining data on user preferences," "exploring theories and algorithms to be used in viewer clustering...efforts will concentrate on the application of fuzzy set theory," and "building optimization models, through mathematical programming, for scheduling video programs on TV channels." (The patented inventions are intended for use by cable television broadcasters as well as by online and other retailers.)

The description of the sponsored research overlaps the inventions described in the patents closely enough to give rise to an inference that the inventions grew out of that research and therefore belonged to the University of Pennsylvania until—after the suit was filed—it quitclaimed its interest in them to Pinpoint in exchange for a modest share of any net revenues

earned by Pinpoint on the patents. The fact that the share was modest—6 to 7 percent—could be evidence that the university did not have much confidence that it really owned the patents. But Pinpoint makes nothing of the point, and anyway we don't know what representations Herz, Ungar, and Zhang made to the university regarding the applicability of the Sponsored Research Agreement to that research.

Ungar, testifying by way of a videotaped deposition (which enabled me to evaluate his credibility), claimed not to remember having done any research under the Sponsored Research Agreement related to the patented inventions. He testified that his work on those inventions was done solely pursuant to a consulting agreement between him and Herz and involved no use of university facilities, which if true would support Pinpoint's reliance on the "made solely by SPONSOR" clause of the Sponsored Research Agreement.

However, I found Ungar's testimony singularly lacking in credibility, especially but not only in light of Zhang's deposition testimony. Zhang's curriculum vitae describes the work he did for Herz and Ungar as "university-sponsored," and when asked why he described it so he answered: "I just can remember I heard the term from either Fred Herz or Dr. Lyle Ungar, so I just used it." Although he denied having stored any of the data for this research on University of Pennsylvania computers, his emails reveal that he did save some of the data on those computers and also that he used the computers for computations that were part of this research and that he couldn't do on his home computer.

I attach no weight to the fact that Zhang was paid for his work on the patented inventions by Herz rather than by the university. It was in the interest of Herz, Ungar, and Zhang to create the appearance that the research was not sponsored research, since, if it was, the inventors would be entitled under the university's patent policy (of which more shortly) to only a 30 percent share of the profits from the inventions, versus the 100 percent share that they would receive if it was not sponsored research.

Ungar's refusal to acknowledge that an email purporting to come from his email address was actually composed by him or with his knowledge was merely the low point of this witness's unsatisfactory testimony. Herz, who also testified by videotape, like Ungar and Zhang denied that the research leading up to the patents had been sponsored research. His demeanor was evasive, his testimony unresponsive, and the selectivity of his recollections implausible.

Pinpoint points to a clause of the Sponsored Research Agreement that requires the university to disclose to the sponsor, that is, to Herz, any inventions "reasonably considered patentable" resulting from the sponsored research; and this was not done. But the responsibility for its not being done lay with Ungar, the principal investigator, who as I have emphasized had a financial interest in enabling Herz to obtain patents that would not be owned by the university. Ungar was a disloyal employee, whose disloyal act could not bind the university in its dealings with the sponsor whom Ungar was assisting in what amounted to a misappropriation of the university's intellectual property.

I conclude that the research conducted by Ungar, Zhang, and their associates that resulted in the patents was conducted pursuant to the Sponsored Research Agreement and that the patented inventions were the intellectual property of the University of Pennsylvania when the complaint was filed, though by virtue of the subsequent assignment they are now the property of Pinpoint.

The remaining issue is whether Wachob, a co-inventor with no university affiliation, was also a co-owner, which if so would as I said, by virtue of his assignment of his interest in the patent to Pinpoint (by way of Herz) before the complaint was filed, secure Pinpoint's standing independently of the university's interest at the time the suit was filed. I find that Wachob (who testified in person at the December 3 hearing) was not a co-owner, on three independent grounds. The first is that although his consulting agreement with Herz did not contain an assignment of intellectual property, it was tacitly understood that he would have no rights in any patents that resulted from Herz's

project. It is clear to me that he never thought he had any rights in the patents. He admitted in his testimony that he had assigned any rights he might have had in the patents to Herz for nothing, "trusting" that if the patents proved to be commercially valuable Herz would give him something for his contribution. I find it implausible that someone who thought he was the co-owner of two potentially very valuable patents (Pinpoint's suit seeks damages in excess of $100 million) would assign his rights for nothing.

Most of Wachob's testimony concerned a letter agreement with the university that he signed this past April, well after the lawsuit was filed. The agreement explains that Wachob's agreement to the terms set forth in the letter is essential to enable the university and Pinpoint to settle their dispute over the ownership of the patents; the reference is to the settlement whereby the university renounced any ownership interest. The letter was sent to each of the five inventors. All five signed.

The letter states that a signatory, and thus Wachob, by signing agrees that at the time of the invention of the two patented inventions on which Pinpoint is suing he was subject to "Penn's Patent Policy," which grants even broader rights to the university than the Sponsored Research Agreement does. The policy states: "It is the policy of the University that all INVENTIONS, together with associated MATERIALS, which are conceived or reduced to practice by INVENTORS in the course of employment at the University, or result from work directly related to professional or employment responsibilities at the University, or from work carried out on University time, or at University expense, or with substantial use of University resources under grants or otherwise, shall be the property of the University as of the time such INVENTIONS are conceived or reduced to practice. INVENTORS shall assign to the University all right, title and interest in and to the INVENTIONS, MATERIALS and related patents and shall cooperate fully with the University in the preparation and prosecution of patents." The policy further provides that the inventors shall be entitled to 30 percent of the royalties yielded by the patents.

   The letter to Wachob stated: "You further acknowledge that you have a duty under [Penn's Patent Policy] to assign to Penn any rights you may have in [the patents]." The letter further provides that Wachob will receive 3.75 percent of any royalties that the university receives from the patents. The actual figure is 12.5 percent, but it is 12.5 percent of "Inventors Personal Share," which, as I just noted, is specified in Penn's Patent Policy to be 30 percent of the royalties.

   Amazon.com placed the letter agreement in evidence in an attempt to show that Wachob acknowledged never having had an ownership interest in the patents, since if the patents were indeed covered by Penn's Patent Policy, the university owned them until the assignment to Pinpoint. Wachob, however, testified that since he had already assigned his interest in the patents to Herz, he thought that the letter might have been sent to him in mistake. He emailed Pinpoint to inquire about the matter, but when he received no answer to his inquiry he signed the letter and mailed it back to the university. He did so, he testified, because the letter said that his agreement to its terms was essential to the settlement. He further testified that he was unfamiliar with Penn's Patent Policy.

   By signing the agreement Wachob became bound not only to what was written in the agreement but also to any further commitment incorporated by reference, whether or not he read the incorporated documents or, for that matter, the agreement itself. *Shehadi v. Northeastern National Bank*, 378 A.2d 304, 306 (Pa. 1977); *Berardini v. Kay*, 192 A. 882, 884 (Pa. 1937); *Bernotas v. Super Fresh Food Markets, Inc.*, 816 A.2d 225, 230–31 (Pa. Super. 2002); *Silberman v. Crane*, 44 A.2d 598, 599 (Pa. Super. 1945); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736–37 (7th Cir. 2002); *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97–98 (2d Cir. 2002); *United States Fidelity & Guaranty Co. v. West Point Construction Co.*, 837 F.2d 1507 (11th Cir. 1988) (per curiam). Nevertheless, Pinpoint is correct that merely because Wachob was prepared to acknowledge, in effect, that he had never had an ownership interest in the patent (by virtue of the Penn Patent Policy) didn't mean that he hadn't. It just meant that for the sake of

the settlement he was willing to admit never having had such an interest, just as the university was willing to do when it quitclaimed its interest in the patents in exchange for a share in the lawsuit (the practical significance of its retention of a right to a share of royalties).

However, Wachob's willingness to sign the letter agreement without even finding out whether or not it had been sent to him by mistake, without finding out what he was agreeing to (which depended on the contents of Penn's Patent Policy), and without wondering on what basis he was being assigned a 3.75 percent interest in such net royalties as the university might obtain, persuades me that he indeed had never acquired any ownership interest. He regarded any compensation that he might receive as being in the nature either of a gift or of an acknowledgment that he had made a valuable contribution to a potentially valuable product and should in fairness, rather than as a matter of a property or contract entitlement, receive something over and above the modest fee he had charged for his services under his consulting agreement with Herz (a $1,000 retainer, an hourly fee of $100, and the usual expenses).

It is at this point that Salganicoff's status assumes a minor importance in the case. His consulting agreement expressly ceded all intellectual property rights to Herz. As there is no corresponding clause in Herz's consulting agreement with Wachob, Pinpoint asks us to infer that Wachob retained intellectual property rights. But I consider this evidence overborne by the evidence reviewed above, which convinces me that Wachob never obtained an ownership right in the inventions.

But even if this were wrong, Pinpoint would still lose. If as I have found the patented inventions were the product of sponsored research and therefore were, under the Sponsored Research Agreement, the property of the university, Herz could not vest ownership rights in his consultants without the university's authorization. An attempt to do so would violate the duty of good-faith performance that Pennsylvania law (which controls the interpretation of the agreement by virtue of a choice of law provision in it) imposes on each party to a contract. *Donahue v. Federal Express Corp.*, 753 A.2d 238, 242 (Pa.

Super. 2000); *Kaplan v. Cablevision of Pennsylvania, Inc.*, 671 A.2d 716, 722, appeal denied, 624 A.2d 111 (Pa. Super. 1996); see also *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) (Pennsylvania law); *In re Doctors Hospital of Hyde Park, Inc.*, 337 F.3d 951, 955 (7th Cir. 2003) (Illinois law); *Lockwood International, B.V. v. Volm Bag Co.*, 273 F.3d 741, 745 (7th Cir. 2001) (Wisconsin law). For it would mean that Herz could have directed an employee of Pinpoint to assist in the sponsored research, listed the employee in the patent application as an inventor, have the employee assign his interest in the invention to Pinpoint, and claim therefore to be a co-owner of the patent, along with the University of Pennsylvania, even though the Sponsored Research Agreement required that patents growing out of the sponsored research be the sole property of the university. The fact that Wachob was not a signatory of the Sponsored Research Agreement is irrelevant. His property right if any in the patents was subject to the property rights earlier vested in the university by virtue of that agreement. He could not obtain a superior right by virtue of his principal's (Herz's) breach of contract. See *In re Phillips' Estate*, 55 A. 213 (Pa. 1903); *Ford Motor Credit Co. v. Caiazzo*, 564 A.2d 931, 934 (Pa. Super. 1989); *Daniels v. Anderson*, 624 N.E.2d 1151, 1158 (Ill. App. 1993). The same is true of Salganicoff, and *a fortiori* of the university inventors.

Maybe as a matter of prudence the university should have required Herz to require anyone working with him on sponsored research to sign an acknowledgment of being bound by the Sponsored Research Agreement. But the university's contract rights are clear without such a clause, and anyway it would have made no difference here, because Herz's position is that no one who worked on the patented inventions was conducting sponsored research.

I reach this conclusion by still a third route. If, as I have concluded, Herz was required by the Sponsored Research Agreement that he and Ungar had signed to transfer to the University of Pennsylvania the intellectual property resulting from the research by Ungar and the others, and instead of doing so he allowed Wachob to gain ownership rights, then,

whether or not Wachob acquired such rights, once he transferred them back to Herz by assignment Herz's obligation to transfer ownership to the university would spring back into force. In effect, a constructive trust would be impressed on Herz's rights in favor of the university as their equitable owner by virtue of the Sponsored Research Agreement.

For the reasons stated, Pinpoint did not have standing to file this suit. I have therefore no choice but to direct the entry of judgment dismissing it (without prejudice, *Fieldturf, Inc. v. Southwest Recreational Industries, Inc.*, supra, 357 F.3d at 1269–70; *H.R. Technologies, Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384–85 (Fed. Cir. 2002)) and voiding all previous judicial orders entered in the case, since they were entered in a case over which this court never obtained subject-matter jurisdiction. *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 376 (1940); *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 400 (7th Cir. 1986); *General Star National Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 437 (6th Cir. 2002); *Kocher v. Dow Chemical Co.*, 132 F.3d 1225, 1229 (8th Cir. 1997); *Gould v. Mutual Life Ins. Co.*, 790 F.2d 769, 774 (9th Cir. 1986).

*/s/ Richard A. Posner*
Richard A. Posner
Circuit Judge

December 6, 2004